Jonathan Corbett, Esq. (CA Bar No. 325608)
**CORBETT RIGHTS, P.C.**
5551 Hollywood Blvd., Suite 1248
Los Angeles, CA 90028
Phone: (310) 684-3870
FAX:  (310) 675-7080
E-mail: jon@corbettrights.com
*Attorney for Claimants Jasmol Singh & Umit Bagga*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br>*Plaintiff,*<br><br>v.<br><br>$200,000 in U.S. Currency,<br>*Defendant* | Case No. 2:22-CV-7443-AB-PD<br><br>**NOTICE OF MOTION TO DISMISS COMPLAINT WITH INCORPORATED MEMORANDUM**<br><br>Motion Date: Feb. 3rd, 2023, 10am<br>Courtroom 7B |

**PLEASE TAKE NOTICE** that pursuant to Fed. R. Civ. P. 12(b)(6), E(2)(a), G(2)(f), and G(5)(b), Claimants Jasmol Singh and Umit Bagga hereby move the Court, at the above time and location, to dismiss the government's complaint and order the government to amend their complaint or return the defendant *res* to Claimants, and submit the incorporated memorandum, *infra*, in support of their motion.

Pursuant to L.R. 7-3 and the Standing Order of the Court, the undersigned counsel states that the general subject matter of this motion – that is, that the government is unable to connect the *res* with unlawful activity – has been thoroughly discussed with opposing counsel on multiple occasions. However, the undersigned counsel was not able to reach opposing counsel to discuss this motion in particular

because the only attorney for the government to have appeared in this case is "on extended leave until 1/30/23," and a responsive pleading is due before that date[1].

## INTRODUCTION

Claimants are immigrants who legally moved to this country more than a decade ago to pursue perhaps one of the most quintessential aspects of "the American dream:" ownership of their own business. Having worked and saved from pennies, while fastidiously following the laws of the land they have chosen to call home, they and their family now own a restaurant as well as a cell phone sales business that focuses on exporting to emerging markets (*e.g.*, Latin America). The cell phone business is registered with the Cal. Secretary of State, pays taxes, and has transaction records demonstrating the purchase of 6-figures worth of cell phones.

The government here, at best, "mistook" transactions for cell phones as transactions for drugs; at worst, they recklessly disregarded missing and exculpatory evidence and conducted a seizure without probable cause. Regardless of whether a good-faith mistake or bad-faith use of civil forfeiture, the government has destroyed a legitimate business and turned the lives of innocent Americans upside down by confiscating $200,000 of lawful business funds.

Claimants can prove the above at trial. However, because the lack of evidence connecting the defendant property with unlawful drug trade is apparent from the Complaint, the Court should spare Claimants the expense and emotional burden of trial and dismiss the Complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim that meets the obligations of the federal rules.

---

[1] Claimants have chosen a motion return date several weeks after the minimum set by the Court's individual rules: 1) to presumably accommodate a new AUSA to be assigned to the case, and 2) to accommodate international travel by the undersigned counsel occurring during the first return date that was available.

## STANDARD OF REVIEW

"To defeat a Rule 12(b)(6) motion to dismiss, the complaint must provide enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests. The complaint must also be plausible on its face, allowing the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Colt Int'l Clothing Inc. v. Quasar Sci., LLC*, 304 F. Supp. 3d 891, 892 (C.D. Cal. 2018) (Birotte, J.) (*internal quotations and citations omitted*).

Under Rule E(2)(a), a complaint *in rem* must "state the circumstances giving rise to the forfeiture claim with sufficient particularity that the claimant can commence a meaningful investigation of the facts and draft a responsive pleading and permit a reasonable belief for pleading purposes that the property in question is subject to forfeiture." *United States v. Aguilar*, 782 F.3d 1101, 1108-09 (9th Cir. 2015) (*cleaned up*).  This "is a higher standard than 'notice pleading.'" *Id*. at 1109. "Supplemental Rule G(2)(f) was intended to codify the interpretation of Rule E(2)(a)" as applied in case law. *Id*.

At trial, "[t]he Government must prove, by a preponderance of evidence, that a 'substantial connection' exists between the seized currency and an illegal drug transaction." *United States v. $53,743.00 in U.S. Currency*, 17-CV-43 at *5 (D. Mont., Dec. 12th, 2017), <u>citing</u> 18 U.S.C. § 983(c)(1) and (3). "A civil forfeiture complaint proves sufficient for pleading purposes, if the complaint, read in the light most favorable to the government, alleges facts that would support a reasonable belief that the seized currency was more likely than not connected to an illegal drug transaction." *Id.*

# ARGUMENT

## I. The Complaint Omits Specific Details Sufficient to Draw the Conclusions Necessary to Support Its Allegations

The basis of the seizure of Claimant's money, as alleged in the complaint, can be stated succinctly. The government was wiretapping an individual they allege is a known drug trafficker ("TRAFFICKER 1"). Compl., ¶ 9. They allege that TRAFFICKER 1 works for a drug trafficking organization from which they have seized many kilograms of drugs. *Id*., ¶ 10. During the wiretap, they intercepted a call between TRAFFICKER 1 and Claimant Jasmol Singh discussing the movement of $80,000, and later, $200,000, using "coded language;" to wit, referring to money as "documents." *Id*., ¶¶ 11 – 13. Then, on December 8th, 2021, they observed the attempted transaction for the $200,000 by staking out a shopping center, where they observed the exchange of a dollar bill, and thereafter, swooped in, and with supposed "verbal consent" searched a vehicle for, and seized, $200,000 in currency that was rubber-banded in a plain bag – but found no drugs. *Id*., ¶¶ 16 – 20. Two men were arrested and released on scene, and the money was turned over to the U.S. Marshals. *Id*., ¶¶ 6, 23. An unspecified period of time later, a drug dog alerted on the money. *Id*., ¶¶ 24, 26.

The government tellingly omits the following details: 1) the name of the individual who was wiretapped, 2) the name of the drug trafficking organization, 3) the basis for concluding that the individual worked for the drug trafficking organization, 4) the type or quantity of drugs allegedly being bought or sold, 5) any mention whatsoever, coded or not, of drugs on the wiretap between Claimant Singh and "TRAFFICKER 1," and 6) the disposition of the criminal cases against the men arrested.

As to the first and second of these, on first glance it may seem reasonable for the government to withhold the names of the individual and organization to avoid interfering with an ongoing investigation. But, having arrested two men and seized

$200,000, and then having publicly filed the Complaint in this action, together with a full year having passed, it is obvious that the individual and organization (if it exists) are now both on notice that the government is on to them and was wiretapping their phones. In other words, hiding their identities from the Court and the public does nothing to prevent theses "suspects" from understanding that the Complaint speaks of them. The government makes not even an allegation that it needed to keep these identities confidential for legitimate purposes.

This ties into the third omission. The government's case relies on the fact that the person they were wiretapping has a connection to dealing drugs. But what we have here is the threadbare allegation that this individual was connected to an unspecified drug trafficking organization without any basis for that connection. A statement that police "identified" this person as a drug trafficker, Compl., ¶ 9, without more, provides insufficient detail to allow the Court to draw the same conclusion or to allow Claimants to "commence a meaningful investigation of the facts."

The fourth and fifth omissions – any allegation of talk of drugs, whether coded or not during the intercepted phone calls – again combine with the previous omissions to cast strong doubt on the government's conclusions. If we have an individual, whose connection to a drug trafficking organization is without any stated basis other than police say-so, engaging in a phone call in which he speaks of money, but *not* drugs, there is not a reason in the world to connect these facts, thus far, with drugs. Although the government may not need to demonstrate which drug was being trafficked, or how much of it, its failure to identify any discussions of either of those facts, or any supplemental evidence to tend to show the same, casts strong doubt on whether there were drugs involved at all. (A discussion on the "coded language" allegation is *infra*.)

The final omission – any details on the criminal proceedings allegedly initiated on the date of the seizure – casts doubt on whether the government actually

conducted any criminal proceedings. To be sure, a civil forfeiture proceeding requires no criminal proceedings whatsoever, but if the government initiated a criminal matter, Claimants should be able to "commence a meaningful investigation" of what happened there. It would certainly be relevant if a court held that the search was conducted without probable cause, or if facts came to light exonerating the defendants. But, perhaps even more importantly, the undersigned counsel was unable to find a criminal case, brought in the county where the seizure occurred, against individuals with the names written in the complaint, on drug charges in 2021 or 2022, casting doubt on the reliability of the complaint.

Rule E(2)(a) requires the government "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, *without moving for a more definite statement*, to commence an investigation of the facts and to frame a responsive pleading" (*emphasis added*). See also Aguilar at 1108. While Claimants are able to prove their legitimate business activities with documentary evidence, the government has left them without a basis to investigate and dispute facts that they plan to use against them. While it may be possible that Claimants' evidence is so weighty that they would prevail even without disputing the government's predicate facts, they have a right not to be so limited.

The omissions cast doubt on the government's case, as there is no reason to omit such details if they are not disfavorable to their case. Indeed, even if some of the omissions are not because the truth would look bad, but because the government does have the information, it would tend to negate the plausibility of their allegations and conclusions.

## II. The Allegations Are Insufficient to Conclude the Existence of a Connection Between the Seized Funds and the Drug Trade

Omissions notwithstanding, the facts the government uses to support its argument are: 1) the communication between Claimant Singh and a known drug

trafficker, 2) the coded language used on the call, 3) the dollar bill, 4) the attempt to leave upon being spotted by authorities, 5) the large amount of currency seized, 6) the "rubber banding" of the currency, 7) the drug dog alert on the currency.

As to the first, even if the government had legitimate knowledge that Claimant Singh was communicating with a known drug trafficker[2], this can only support the *start* of an investigation, because, as should be obvious, even known drug traffickers have lives during which they conduct legitimate business. Drug traffickers buy meals, they buy clothing for their children, they buy tickets to movies, and they buy cell phones. Other than the transaction that gave rise to the complaint, the government provides no basis for Claimants to have been on notice that they were interacting with a supposed drug dealer. It may, of course, turn out that Claimants were unknowingly selling cell phones to someone who *happens to* traffic in drugs[3]. But regardless, talking to or doing business with someone suspected of trafficking drugs is not a sufficient basis to conclude that the funds seized here were associated with the drug trade and seize them for forfeiture.

As to the second, the government alleges that "coded language" was used during the intercepted phone call between Claimant Singh and the anonymous drug trafficker. Compl., p. 3. In particular, they allege that the word "documents" was used to refer to U.S. Currency. *Id*. The government does nothing to explain why it concluded the parties actually meant currency, as opposed to legal documents,

---

[2] To be clear, Claimants, both back in December 2021 and today in December 2022, have no reason to suspect that they were doing business with a drug trafficker, and if this case proceeds past the motion to dismiss stage, will put forth evidence that they were trading with known, legitimate businessmen in Latin America.

[3] Indeed, most "mafias" engage in multiple rackets, and it would not at all be surprising to learn that one who deals in drugs also deals in cell phones, avocados, and limes. But one who sells the mafia lawful goods has not committed a crime, nor are their innocent funds forfeitable, at least absent some variety of scienter that is not at all alleged in the complaint.

newspapers, or otherwise. On the contrary, they allege that when the $200,000 amount was communicated, it was communicated as "200," and not "200 documents." Compl., ¶ 13. Notwithstanding, even if the parties were referring to currency, it would be reasonable for individuals not to wish to announce to anyone within earshot that they are holding $200,000 in cash in order to avoid robbery. The undersigned presumes that those who move legitimate currency through Latin America have more reasons to be cautious than most would comprehend.

As to the third, the allegation that a dollar bill was inspected as a means of identifying the parties, again, does not lead a reasonable reader to conclude that the identification (if that was the true purpose) was a security technique to protect the trade *of drugs*. As discussed *supra*, anyone moving $200,000 in cash for any reason would be wise to take security precautions. But, more importantly, the allegation alleges this happened on the street or sidewalk in front of a shopping center. Compl., ¶ 16. There is no allegation that the shopping center was a place where drug activity was frequent, and the parties' complete failure to conceal this activity do not bolster an argument that what was occurring was a trade of cash for what would presumably would buy many kilograms of hard drugs. It instead supports innocent business activity.

As to the fourth, the government appears to want a reader of the complaint to conclude that there was an attempt to flee upon realization that police were watching. Compl., ¶ 18 ("attempted to quickly get into the Vehicle's driver-side door"). What the government means by "quickly" in uncertain, but what followed was *complete cooperation* by the individuals in the car: the occupants identified their purpose and allegedly gave verbal consent to a search. Compl., ¶¶ 19, 22. There is no allegation that these individuals refused to answer any questions, were evasive, gave contradicting or doubtful accounts, or otherwise. And they were found in possession of no unlawful items. Further, we are left with a strange conclusion to the interaction with the men in the vehicle: they were allegedly cited for drug trafficking and

*released on scene*. Compl, ¶ 23. The charges allegedly made would be for a very serious felony in California. Why, with all the evidence the government alleges they had, were these men sent on their way?

As to the fifth, a large amount of currency can also be a start to the evidence required to justify a seizure, but it is not by itself. *U.S. v. Approximately $28,120.00 in U.S. Currency*, 1:13-CV-640 at *6 (E.D. Cal., Dec. 23rd, 2014) ("A large amount of money standing alone, however, is insufficient to establish probable cause"). *Active attempts to hide* a large amount of currency may support the same. *U.S. v. U.S. Currency $83,310.78*, 851 F.2d 1231 (9th Cir. 1988) (person hiding cash also had previous conviction for drugs). But here, no attempts were made to hide the cash. The currency was located in a plain cardboard box in the passenger compartment[4]. Compl, ¶ 19. And again, consent was allegedly given for police to search. *Cf. United States v. Casahonda*, No. CR 17-1904-TUC-CKJ (LCK) (D. Ariz., June 30th, 2021) (failure to consent constitutes concealment).

As to the sixth, the government allege that the currency "was rubber-banded in a manner consistent with DTO narcotics proceeds." Compl., ¶ 20. The government provides no explanation as to what this means: is there a specific way that drug traffickers rubber-band their money, or was it the mere act of rubber banding that was suspicious? *Cf. United States v. $79,010.00 in United States Currency*, 2012 U.S. Dist. LEXIS 48148 at *19 (D. Ariz., Apr. 4th, 2012) (rubber bands + four layers plastic bags + vacuum seal gives rise to suspicion); *United States v. Approximately $28,120.00 in U.S. Currency*, 1:13-CV-640 (E.D. Cal., Dec. 23rd, 2014) (cellophane and fabric softener sheets probative). Either way, those who do legitimate business in cash surely are unlikely to use banks between each transaction (and thus have bank bands around their notes): if one uses banks, one probably does not trade in

---

[4] The government describes this as "concealed." Short of tossing the cash directly on the seat, it is difficult to think of a less concealed way to carry $200,000.

cash, and further, cash would be regularly counted as it is traded, thus breaking any bank bands. The government, notably, does not allege the type of "small, unmarked bills" often associated with criminal activity. *United States v. $19,520.00 in U.S. Currency*, 20-CV-02100 (D. Ariz., May 13th, 2021) (large amount of money in $20s common in drug trade). Rubber bands alone are not indicative of drug money.

As to the seventh and final attempt at support, the government speaks of a drug dog search that they allege happened "[u]pon returning to FPD offices." Compl., ¶ 24. It is entirely unclear why the money was brought to the dog, and not the dog to the money, casting large doubt upon the reliability of this search. But even if the search was reliable, the Ninth Circuit has accepted that "seventy-five percent" of currency "in Los Angeles" is contaminated with cocaine. *U.S. v. U.S. Currency*, 39 F.3d 1039, 1042 (9th Cir. 1994). "If greater than seventy-five percent of all circulated currency in Los Angeles is contaminated with drug residue, it is extremely likely a narcotics detection dog will positively alert when presented with a large sum of currency from that area [and] the probative value of a positive dog alert in currency forfeiture cases in Los Angeles is significantly diminished." *Id* at 1043. Indeed, "extremely likely" may be an understatement: assuming the $200,000 was comprised only of the largest note ($100), there would be 2,000 notes, and if each has a 75% of being contaminated, it is a mathematical certainty (>99.999999% chance) that at least 1 note is contaminated.

It is understood that the aggregation of facts, each one insufficient standing alone, may suffice to meet the government's burden. *United States v. U.S. Currency, $83,310.78*, 851 F.2d 1231, 1235 (9th Cir. 1988). But here, we have no drugs found. We have no allegation that the owner of the seized money ever spoke of drugs (in "code" or otherwise). We have not the name of the alleged drug cartel, nor of the wiretapped trafficker, nor of the drug that was allegedly to be trafficked. Neither Claimants nor the people arrested with the cash are alleged to have any criminal history. No attempt was made to conceal the cash. All parties were cooperative and

consented to a search. No lies, contradictions, or evasiveness was alleged. The government has, at most, evidence of a large cash transaction between parties who took some precautions to avoid publicizing that they were on the streets of Los Angeles with large quantities of cash.

The government's complaint was required to establish a "substantial connection" between the money and the drug trade. Even accepting all of the government's well-pled allegations as true, each of the facts the government asks us to aggregate into a whole case are far too flimsy to support that weight, especially in light of the mitigating facts, glaring omissions, and ample innocent and non-far-fetched explanations for any factors of suspicion. The complaint, on its face, simply fails to demonstrate that the seized funds had a substantial connection to a drug deal.

## CONCLUSION

For the foregoing reasons, the government's complaint should be **dismissed** for failure to state a claim upon which relief may be granted and/or failure to comply with Rules E(2)(a) and G(2)(f), and the government should be **ordered** to amend its complaint within 21 days or return the seized money to Claimants.

Dated:	Los Angeles, CA
	December 9th, 2022

Respectfully submitted,

_____/s/Jonathan Corbett_____
Jonathan Corbett, Esq. *(CA Bar 325608)*
**CORBETT RIGHTS, P.C.**
5551 Hollywood Blvd., Suite 1248
Los Angeles, CA 90028
Phone: (310) 684-3870
FAX: (310) 675-7080
E-mail: jon@corbettrights.com
*Attorney for Jasmol Singh & Umit Bagga*