# **EXHIBIT A**

## EXPERT REPORT OF PETER L. PLATT

*Introduction*

1.   I have been asked to review documents and provide an expert opinion in United States v. $200,000 in United States Currency, C.D.Cal. Case No. 22-CV-7443-AB. Specifically, plaintiff United States of America has asked me through their counsel to opine on the following:

   1.1.   The generally-accepted structures and phases of money laundering activity;

   1.2.   The laundering of the proceeds of illegal narcotics sales through the sale and resale of tradable goods, also known as Trade Based Money Laundering, or "TBML"; and

   1.3.   Whether, based on my review of materials provided to me, a business bank account at J.P. Morgan Chase Bank ending in "1679", held in the name of JASMOL SINGH DBA PHONE TRADERS CO  (the "Chase Account") and a Wells Fargo personal checking account ending in "8660", held in the name of JASMOL SINGH BAGGA (the "WF Account") bear indicia of money laundering activity or other financial crimes.

*Education & Training*

2.   A current version of my CV is attached as Exhibit A to this Report.

*Relevant Experience*

3.   Based on my education, training, and 40 years of law enforcement and financial investigative experience, I am knowledgeable about various money laundering schemes and methods, including TBML, and including enforcement of relevant statutes that criminalize money laundering and other related financial crimes under U.S. federal law.

4.   Some of my relevant experience includes, but is not limited to, participating in numerous investigations in which narcotics proceeds were, or were intended to be, transferred in a manner consistent with money laundering to avoid detection from law enforcement as well as bank and other financial institution personnel. For purposes of this report, the term "bank or banks" when used includes all financial institutions defined in the Code of Federal Regulations, 31 CFR 561.309. Also, the terms "cash or currency" are used interchangeably for the purpose of this report.

5.   I have also been the manager of a fraud investigative unit with a large financial institution headquartered in Los Angeles, California, and am familiar with schemes by money launderers to defeat detection by bank personnel and circumvent mandatory federal and state reporting requirements by financial institutions under the Bank Secrecy Act.[1]

6.   As a retired Internal Revenue Service, Criminal Investigation Division Supervisory Special Agent and current Senior Financial Investigator working for the Drug Enforcement Administration, I have investigated and assisted in the prosecution of numerous people and criminal organizations involved in TBML activities.

7.   I have also taught and continue to teach the elements and red flags and signs of TBML and other money laundering schemes to federal, state, and local law enforcement officers.

*Disclosures*

8.   In preparing this report, I have reviewed the following materials (identified by bates-stamps where available):

   8.1.   The Complaint in this case (the "Complaint");

---

[1] Based on my training and experience, I know that the Bank Secrecy Act, or "BSA," requires certain procedures for financial institutions, and provides for civil and criminal penalties for evading such procedures.

8.2.   Claimants' Responses to the Government's Special Interrogatories(the "Interrogatory Responses");

8.3.   Claimants' Responses to the Government's First Request For the Production of Documents (the "Document Responses" and collectively with the Interrogatory Responses, the "Responses");

8.4.   Documents produced by Claimants marked C-101 through C-216;

8.5.   USAO_00397-00724 (the "Chase Account Records");

8.6.   USAO_00001497-001533 (the "WF Account Records");

8.7.   USAO_SINGH_002164;

8.8.   A publication titled "Advisory to Financial Institutions on Filing Suspicious Activity Reports regarding Trade-Based Money Laundering" published by the Department of the Treasury Financial Crimes Enforcement Network;

8.9.   A publication titled "Update on U.S. Currency Restrictions in Mexico: Funnel Accounts and TBML" published by the Department of the Treasury Financial Crimes Enforcement Network;

8.10.  A publication titled "Trade Based Money Laundering" published by the United States Government Accountability Office; and

8.11.  Additional open source or government records databases, such as the California Secretary of State's Business Search database.

9.   I have not provided expert testimony at trial or by deposition in the past four years, but expect to provide expert testimony before the end of this year in the following case: *United States v. Hyoung Nam So*, CR No.  22-108-AB.

10.  I have agreed to be paid an hourly rate of $75 per hour for my work on this matter. In addition, I am an employee of FSA, which provides contract services to the Drug Enforcement Administration, and receive my regular salary from FSA, although my work on this matter has been conducted on my own time.  I do not

3

have any agreement or expectation to be compensated based on the outcome of this matter.

11.   I have not authored any publications in the previous 10 years. My previous publications are noted on my attached CV.

*Scope of Opinion*

12.   I understand that the government alleges in the Complaint that the defendant assets in this case, which is $200,000 in United States Currency (the "Subject Currency"), consists in whole or in part of illegal narcotics proceeds. I have not formulated any opinion on this ultimate issue.

13.   I also understand that the Claimants contend in the Responses that the Subject Currency was payment to them for the sale of consumer electronics, such as cellular phones, and that they contend that these cellular phones were sold to a buyer in Mexico but were delivered by Claimants to the buyer's agent at the U.S.-Mexico border in San Diego, and allegedly shipped, delivered, or transferred to the ultimate buyer/beneficiary in Mexico. I also have not formulated any opinion on this issue.

*Opinions*

14.   Based on my training, experience, and information and materials I have reviewed, I hold the following opinions:

   14.1.   Money laundering is the process by which illicit money generated by criminal activity is introduced into the financial system and used for legitimate purposes. It's the concealing or disguising the true nature, location, source, ownership and control of illicit funds.

   14.2.   The primary purpose of money laundering by those engaged in criminal activities is to delay or defeat efforts by law enforcement to identify, trace, seize, and confiscate the proceeds of criminal activity though a financial investigative approach, such as asset tracing and/or a financial record analysis.

4

14.3.   Criminals engage in money laundering to receive, hold, and spend the proceeds of crime without detection by law enforcement.  By confusing or obscuring the sources of criminal proceeds, criminals are less likely to be detected by law enforcement and bank personnel when criminals hold or spend those funds or engage in banking transactions.

14.4.   The trafficking of illegal narcotics is often, but not always, conducted with currency. Even where street-level narcotics transactions occur through alternative electronic payment platforms, such as Venmo or Cash App, or other money transfer platforms such as the use of virtual currency e.g., Bitcoin, street-level dealers generally purchase their drug supplies from larger drug trafficking organizations ("DTOs") in currency, to minimize detection by law enforcement and bank personnel.

14.5.   As a result, DTOs often hold large amounts of currency. In most cases, the DTO obtains or manufactures its narcotics from outside the United States. Consequently, the DTO will need to either smuggle this currency into the jurisdiction where they obtain their narcotics or place the illicit proceeds into the financial system so that these funds can be transferred electronically to obtain more narcotics, maintain the infrastructure of the illicit drug operation, and pay members of the DTO's operations.

14.6.   The ultimate goal of the DTO is to conceal or disguise involvement with the underlying crime of narcotics trafficking which generated the illicit funds.

14.7.   There are three components or stages of money laundering: placement, layering, and integration.  Placement is the process of getting the proceeds of crime into the financial system, whether into or through domestic or foreign financial institutions.  Integration is the process of getting that same illicit money back into the commerce stream in an effort to make it appear that the funds came from legitimate sources. By doing

5

this, the money can be spent without attracting attention from law enforcement, federal and state taxing authorities, or bank personnel.

14.8.  Layering is the middle step in the money laundering process. Layering typically involves moving the criminal proceeds through one or more financial institution accounts, such as a typical bank account, brokerage and insurance accounts, casino player's account and virtual currency accounts.  Often, layering involves the use of offshore or bank secrecy jurisdictions, in order to create multiple layers of financial transactions between the crime and the proceeds generated by that crime. Layering is a means of convoluting the movement of illicit funds to thwart law enforcements' effort to trace the funds to its original source and/or beneficiary. This process further makes "following the money" more difficult by investigators.

14.9.  Attached as Exhibit B is an example diagram of how a layered transaction may operate.

14.10. One recognized method of money laundering is TBML. In broad terms, TBML is a process of laundering the proceeds of crime by hiding or disguising criminal proceeds in legitimate commerce transactions of tradeable goods.

14.11. One known TBML scheme is to exchange criminal proceeds generated from the narcotics trade for popular and easily-traded goods. The sale and purchase of these popular goods may not receive the same heighted scrutiny that the sale, purchase or exchange of currency or precious metals receive by law enforcement personnel.[2] These tradeable goods are then exported to a DTO's home market, where they are sold or exchanged

---

[2] Based on my training and experience, I know that under U.S. law, certain types of merchants such as those trading in currency, jewelry, or precious metals, are required to conduct additional due diligence into their clients and keep records of the transactions with their clients.

for currency or bank funds, which can then be spent by the DTOs to purchase more narcotics or fund the DTO's infrastructure.

14.12. Some of the common goods involved in TBML schemes include, automobiles, clothes, textiles, and electronics, including cellular phones.

14.13. TBML schemes are a common method of domestic and international money laundering for DTOs, because the movement of goods between jurisdictions is often harder to track than the movement of electronic bank funds. In addition, the movement or value of goods can be obscured through fraudulent or manipulated invoices, purchase orders or customs declarations.

14.14. Red flags for TBML identified by U.S. Immigration and Customs Enforcement's Homeland Security Investigations include:

14.14.1.   Payments to vendors made in cash by unrelated third parties;

14.14.2.   Unusual business operations or practices that have no apparent economic or business purpose;

14.14.3.   Inconsistent packaging or shipping methods; and

14.14.4.   Unusual shipping routes or transshipment points.

15.   Based on my prior investigations of TBML schemes, other Red Flags include:

15.1.   Fraudulent or the lack of invoices and/or purchase orders;

15.2.   Misrepresentation of price;

15.3.   Misrepresentation of quantity and quality of goods;

15.4.   False appraisals or use of counterfeit goods;

15.5.   Lack of or false tax records, both income and state sales tax;

15.6.   Lack of storage facilities for maintaining inventory of goods;

15.7.   Lack of or fraudulent shipping records; and

15.8.   The use of "funnel" bank accounts.

16.   I know from my experience, knowledge and training that the lack of business records or creation of fraudulent records of the types listed above is a significant

7

sign of potential underreporting of income on a person's business and/or personal federal income tax, which is itself a Red Flag for money laundering.[3]

17. Based on my training, experience, and examination of the materials provided to me, I have reached the following opinions regarding the Chase Account:

    17.1. I have reviewed Chase Account Records for the period of January 2021 through December 2021, which were bates-stamped USAO_SINGH_000397 - 000724.

    17.2. For the purposes of this Report, I have no opinion as to the accuracy or authenticity of the Chase Account Records, and assume for the purposes of my analysis that the transactions reflected in these records are accurate.

    17.3. In my opinion, the Chase Account Records bear indicia of money laundering activity. I reach this opinion based on the following observations:

    17.4. Deposits into the Chase Account largely appear to come in three forms: electronic deposits, cash deposits, and wire transfers.

    17.5. The electronic deposits largely are identified as associated with "Sustain A Bowl,"[4] or have other indicia of a restaurant business, such as references to "Food," "Postmates," or "Uber". These incoming transfers are generally in non-round amounts. Non-round transaction amounts are often a sign of legitimate business activity, as ordinary business activity

---

[3] Based on my training and experience, I know that under California state law, certain wholesalers must obtain resale certifications from the California Department of Tax and Fee Administration in order to avoid paying certain sales taxes, and that wholesalers must still file certain California state tax returns filings on behalf of such a business. It is unclear from the materials presented to me whether Phone Traders has such resale certificates, but the absence of such records, as well as the absence of corresponding California state tax returns, would be another red flag for TBML.

[4] Open source records indicate that Claimant Jasmol Singh is the owner/operator of "Sustain A Bowl," a restaurant located at 8338 Lincoln Blvd, Los Angeles, CA 90045.

will generally reflect taxes, transaction fees, and other costs which will result in non-round transaction activity.

17.6.   In contrast, large amount round-dollar transaction activity is a red flag for money laundering.

17.7.   The Chase Account Records show cash deposits that are generally (but not always) in large, round dollar amounts. For example, over a two-day period in October 2021, I observed the following five deposits, totaling $26850.00.

17.7.1.   An ATM cash deposit of $3950.00 on 10/7/2021;

17.7.2.   An ATM cash deposit of $1950.00 on 10/7/2021;

17.7.3.   An ATM cash deposit of $1950.00 on 10/7/2021;

17.7.4.   A bank branch cash deposit of $9500.00 on 10/8/2021; and

17.7.5.   A bank branch cash deposit of $9500.00 on 10/8/2021.[5]

17.8.   In another instance, I observed the following nine separate ATM cash deposits totaling $14980 over a three-day period.

17.8.1.   An ATM cash deposit of $2160.00 on 12/5/2021;

17.8.2.   An ATM cash deposit of $2040.00 on 12/5/2021;

17.8.3.   An ATM cash deposit of $1980.00 on 12/5/2021;

17.8.4.   An ATM cash deposit of $800.00 on 12/5/2021;

17.8.5.   An ATM cash deposit of $770.00 on 12/5/2021;

17.8.6.   An ATM cash deposit of $390.00 on 12/5/2021;

17.8.7.   An ATM cash deposit of $340.00 on 12/5/2021;

17.8.8.   An ATM cash deposit of $5000.00 on 12/8/2021;

17.8.9.   An ATM cash deposit of $1500.00 on 12/8/2021;

---

[5] I note that it is unclear from the Chase Account Records whether the cash deposits identified in Paragraphs 18.7.4-5 occurred in the same or different bank branches. Splitting cash deposits between different bank branches on the same day is a comment technique used to circumvent AML procedures required under the BSA.

17.9.   Three days later, on December 11 and 12, 2021, I observed the following nine separate deposits, totaling $16460.00:

17.9.1.       An ATM cash deposit of $2780.00 on 12/11/2021;

17.9.2.       An ATM cash deposit of $1080.00 on 12/11/2021;

17.9.3.       An ATM cash deposit of $140.00 on 12/11/2021;

17.9.4.       An ATM cash deposit of $2000.00 on 12/11/2021;

17.9.5.       An ATM cash deposit of $2000.00 on 12/11/2021;

17.9.6.       An ATM cash deposit of $2480.00 on 12/12/2021

17.9.7.       An ATM cash deposit of $2000.00 on 12/12/2021;

17.9.8.       An ATM cash deposit of $2000.00 on 12/12/2021;

17.9.9.       An ATM cash deposit of $1980.00 on 12/12/2021;

17.10. Based on my training and experience, I know that under the BSA, financial institutions as defined in 31 CFR 561.309, are required to file currency transaction reports or "CTRs," with the Financial Crime Enforcement Network (FinCEN), on currency transactions over $10,000. These CTRs are available to law enforcement investigators and bank regulators.

17.11. In addition, I know that criminals are often aware of this $10,000 threshold for mandatory reporting by financial institutions. As a result, criminals often attempt to break up large cash deposits into amounts just under $10,000, an attempt to avoid the filing of CTRs which might draw attention of bank personnel and ultimately law enforcement.  This practice is referred to as "structuring" and is a significant red flag for money laundering activity.[6]

17.12. I also know that criminals often break up large cash deposits into much smaller amounts and make multiple cash deposits on the same day or

---

[6] In addition, structuring activity itself may be a violation of federal law in certain circumstances under the Title 31 provisions of the United States Criminal Code.

subsequent days to circumvent the bank's CTR reporting requirement. This is known as "micro-structuring."

17.13. One additional subset of electronic deposits into the Chase Account is notable: on at least 26 occasions, and often 2-3 times per month, the Chase Account received funds transfers in the amount of $9975.00 from "Oversea Chinese Banking Corp Ltd" identified as for "The Cell Story."[7] Such repeated transfers in amount close to, but under, $10,000 suggest structuring activity. Although these transfers were not conducted in currency, I know from experience that many criminals and money launderers believe that any form of money transfer over $10,000 will require and generate some financial institution reporting to the U.S. government. Consequently, electronic transfers between criminal associates will often be conducted under $10,000 when in fact there is no business purpose for doing so.

17.14. In addition, on at least 23 occasions in 2021, funds were transferred from the Chase Account to Coinbase, a major domestic cryptocurrency exchange. These transfers totaled $73,000. I also observed multiple transfers to other cryptocurrency exchanges, including nine transfers to "Prime Trust LLC", an entity associated with the cryptocurrency exchange Binance, totaling $15,000. For example, on October 12, 2021, roughly four days after the cash deposits detailed in paragraph 17.7, $19000.00 was electronically transferred to Coinbase in three transfers on

---

[7] Beginning on October 12, 2021, this payor began to transfer roughly $19975.00 per payment to the Chase Account, which it did on nine occasions from October 12, 2021, through the end of that year. I understand from the Complaint that the Subject Currency was seized on October 8, 2021. I know from experience that when law enforcement agents execute an enforcement action such as a search or seizure, criminals may respond by altering prior patterns of activity that may have been perceived as suspicious or detectible by law enforcement.

11

the same day. Each of these three transfers to Coinbase on that date was also under $10,000.

17.15. In summary, the Chase Account Records show that funds flowing into the Chase Account were often in large sums of cash, broken up into smaller deposits, rather than bank deposits in amounts greater than $10,000.

18. Based on my training, experience, and examination of the materials provided to me, I have reached the following opinions regarding the WF Account:

18.1. I have reviewed WF Account Records for the period from November 2020 through June 2021, which were bates-stamped USAO_SINGH_001497 - 001533.

18.2. For the purposes of this report, I have no opinion as to the accuracy or authenticity of the WF Account Records, and assume for the purposes of my analysis that the transactions reflected in these records are accurate.

18.3. One common element of TBML schemes, as well as other money laundering schemes, is the use of "funnel accounts" to move, transfer, collect and commingle criminal proceeds from different locations in the United States. FinCEN has described a funnel account as follows:

> *"An individual or business account in one geographic area that receives multiple cash deposits, often in amounts below the cash reporting threshold, and from which the funds are withdrawn in a different geographic area with little time elapsing between the deposits and withdrawals."*

18.4. The WF Account Records bear indicia of money laundering, and in particular, use as a funnel account. Specifically:

18.4.1. On January 19, 2021, an ATM withdrawal of $2000.00 was made in Hollywood, Florida, and on January 20, 2021, an ATM cash deposit of $2000.00 was made in Los Angeles California. Five days

12

later, on January 25, 2021, an ATM withdrawal of $1500.00 was made in Miami Beach, Florida.

18.4.2.    On March 8, 2021, four ATM cash deposits were made in Los Angeles, CA. Three deposits were $600.00 each and a fourth cash deposit was for $200.00, totaling $2000.00. Then on the same day, March 8, 2021, a $2000 ATM withdrawal was made in Pompano Beach, FL

18.4.3.    On March 29, 2021, ten ATM cash deposits were made at ATMs located in Los Angeles, ranging from $600.00 to $420.00, totaling $4980.00. On March 24, 2021 and March 29, 2021, two ATM withdrawals were made of $2000.00 each, both from ATMs located in Sunrise, Florida.

//

//

19.   While I have no opinion as to whether the Subject Currency is subject to forfeiture as alleged in the Complaint, subject to the above-stated assumptions, I am of the opinion that activity in the Chase Account and the WF Account are indicative of money laundering activity.

Dated: October 6, 2023

_____
PETER PLATT

# EXHIBIT A

# PETER L. PLATT, JD, CAMS, CFI

## PROFESSIONAL SUMMARY

Management:        Twenty-seven years as an IRS, Criminal Investigation Special Agent with numerous special duty assignments, culminating as a Supervisory IRS Special Agent; Over twelve years as a Senior Financial Investigator and consultant for the U.S. Department of Justice

Key Knowledge:    Strong working knowledge and understanding of white-collar and organized crime laws and regulations including AML/BSA, FinCEN, OFAC, and asset forfeiture laws.  Subject matter expert in money laundering and financial investigative methods for Central Federal Judicial District of California

Education:          Juris Doctorate (JD) Law Degree; Business Management Undergraduate Degree

Certifications:       CAMS – Anti-Money Laundering Specialist; CFI - Certified Financial Investigator

Security Clearance:   **Secret** - Current

## CAREER HIGHLIGHTS

2019-Present   **U.S. DEPARTMENT OF JUSTICE - Drug Enforcement Administration**

**SENIOR FINANCIAL INVESTIGATOR (contractor - FSA) – Tactical Diversion Squad, Reno, NV**
- Conduct complex financial investigations relative to the illicit manufacturing, importation, distributing and selling of opiate based drugs.
- Identify, collect, and interpret financial evidence to support federal indictments for violations of the United States Criminal Code, Titles 18, 21, 26 and 31.
- Expert on AML/BSA and forfeiture issues including Money Service Businesses (MSBs) and Trade based Money Laundering (TBML) methods and white-collar fraud schemes.

2015-2019       **CITY NATIONAL BANK, Los Angeles, CA**

**VICE PRESIDENT, MANAGER OF FRAUD INVESTIGATIONS**
- Managed Investigations, Fraud Detection and Loss Prevention functions. Responsible for managing and developing the Investigation Fraud Detection and Loss Prevention staff in their job responsibilities of reviewing potentially fraudulent activity including money laundering and Bank Secrecy Act violations.
- Oversaw efforts of the Fraud Detection team, monitoring, and sampling "Know Your Customer/Enhanced Due Diligence/Compliance" files and SAR (Suspicious Activity Report) files to identify Ponzi scheme activities, investor fraud, pyramid schemes, kiting and other criminal activities.
- Used fraud detection alerts and other potential indicators of client fraud to conduct investigations into potentially fraudulent activities.

2008-2015       **U.S. DEPARTMENT OF JUSTICE (Organized Crime Drug Enforcement Task Force)**

**SENIOR FINANCIAL INVESTIGATOR (contractor) – Financial Investigative Group, DEA, Los Angeles.**
- Conducted complex financial investigations on domestic and international white-collar crime, organized crime, and terrorist organizations.
- Identified, collected, and interpreted financial evidence to support federal indictments for violations of the United States Criminal Code, Titles 18, 21, 26 and 31.
- Established excellent working relationship with Department of Treasury, OFAC and FinCEN personnel as well as many federal, state, and local law enforcement and regulatory agencies.

1

- Expert on AML/BSA and forfeiture issues including Money Service Businesses (MSBs) and Trade Based Money Laundering (TBML) methods and white-collar fraud schemes.
- Taught federal agents and local law enforcement officers on financial and AML/BSA investigative methods.

1982-2008 **U.S. DEPARTMENT OF TREASURY, INTERNAL REVENUES SERVICE, CRIMINAL INVESTIGATION**

**SUPERVISORY SPECIAL AGENT – Los Angeles Field Office, 2004 - 2008**
- Supervised and managed up to 12-senior IRS Special Agents, who conducted complex financial investigations of all types for the IRS-CI, Los Angeles Field Office.
- Ensured case evidence supported federal indictments for violations of the United States Criminal Code, Titles 18, 21, 26 and 31 including fraud of all types; bank, mortgage, bankruptcy, insurance, healthcare, wire, mail, tax, narcotic investigations, terrorist financing, political and government corruption, and violations of AML/BSA and other related white-collar crime statutes.

**RESIDENT COURSE DEVELOPER & INSTRUCTOR – IRS National Criminal Investigation Training Academy, Federal Law Enforcement Training Center, Brunswick, GA - 2003-2004**
- Developed and taught financial investigative methods and techniques as well as AML/BSA course material to basic and advance IRS Special Agents at the IRS Criminal Investigation National Academy

**SPECIAL AGENT – San Diego Field Office 1986-2003; Dallas Field Office 1982-1986**
- Conducted complex financial investigations involving criminal violations of the U.S. Code Titles 18, 26 & 31.
- Investigated crimes in the areas of money laundering, BSA, bank fraud, insurance and medical fraud, narcotics trafficking, racketeering, organized & white-collar crime (Ponzi schemes), political corruption, illegal gambling, and tax evasion.
- Required advanced knowledge and application of AML/BSA laws, forensic accounting/auditing procedures, intelligence gathering techniques, asset identification/forfeiture laws and procedures, communication skills, interviewing and report writing skills, courtroom testimony, as well as strong organizational and analytical abilities.
- Gave many lectures to financial institutions, civic and professional groups on fraud and AML/BSA investigation topics.
- Was the San Diego Field Office Suspicious Activity Report (SAR) Review Committee Coordinator.

1980-1982 **DALLAS POLICE DEPARTMENT, DALLAS, TEXAS**

**PATROL OFFICER**
- Answered calls for assistance of various types.
- Achievements during 18-week police academy included highest academic average and class president.

1979-1980 **COLLIN COUNTY, MCKINNEY, TEXAS**

**COLLIN COUNTY COMMISSIONER**
- Was appointed by the County Judge to fulfill the un-expired term of the previous commissioner. Managed and supervised twelve county precinct employees.
- Responsible for all fiscal affairs for the County precinct and conducted all other county business in conjunction with the responsibilities and powers of the Commissioner's Court, including fiscal oversight of the County Sheriff's Department and Courts.

1974-1979 **PLANO POLICE DEPARTMENT, PLANO TEXAS**

**PATROL OFFICER & INVESTIGATOR** (1974 – 1979)
- Lead Investigator to head the department's first juvenile investigation unit.
- Helped in developing procedural guidelines for handling juvenile offenders.
- Received the highest award given by the Plano Police Department, **Police Officer of the Year - 1978**.

2

| | |
|---|---|
| **MILITARY SERVICE** | Served in the U.S. Navy from 1970 to 1972.<br>Last duty station - Naval Amphibious Base, Coronado, California (UDT/SEAL training)<br>Honorably discharged, injured during training. Held **top secret** clearance. |

**EDUCATION**

1991-1994      **Juris Doctorate** (JD) - law degree from Thomas Jefferson School of Law, San Diego, California

1974-1979      **Bachelor of Business Administration** – Management, Minor in Criminal Justice, Abilene Christian University, Abilene, Texas

**PUBLISHED BOOKS & ARTICLES**

**FINANCIAL INVESTIGATIONS - A FORENSIC ACCOUNTING APPROACH TO DETECTING AND RESOLVING CRIMES**
Co-author. U.S. Department of Treasury, Internal Revenue Service. U.S. Government Printing Office, 2002

**"REPORTING CASH PAYMENTS OVER $10,000 TO THE IRS"**
San Diego Realtor Magazine, January 1996
San Diego, California

**"INTRODUCTION TO MONEY LAUNDERING"**
Law Enforcement Quarterly, November 1992
Office of the District Attorney, San Diego County
San Diego, California

**"TO SERVE AND STEAL?"**
Scene Magazine, Dallas Morning News, February 1982
Dallas, Texas

**CERTIFICATIONS:**
- Certified Anti-Money Laundering Specialist (ACAMS*)       February 2019
- Certified Financial Investigator (State of California)       October 2015

**OTHER RELATED EXPERIENCE:**

**Drug Enforcement Administration – Diversion Training Unit, Quantico, VA (Feb-April 2023).** Taught Diversion Investigators, DEA Special Agents and Task Force Officers money laundering and financial investigative techniques and methods.

**Nevada Threat Analysis Center – Nevada Department of Public Safety (2021 to present).** Teach 8-hour financial investigations and AML/BSA course that I developed to local, state, and federal law enforcement personnel. (NV POST certified course)

**Nevada High Intensity Drug Trafficking Area (NV-HIDTA)** (2011 – 2018). **Financial Investigations Course Developer & Instructor Los Angeles High Intensity Drug Trafficking Area (LA-HIDTA)** (2010 – 2018)
- Created 8-hour financial investigations and AML/BSA course for both the LA-HIDT and NV-HIDTA. Taught local, state, and federal law enforcement personnel AML/BSA and financial investigative techniques and methods.

**KIPP – Knowledge, Intelligence Program Professionals** (2014-2018)
- Contracted with KIPP to create and teach a 2-day AML/BSA course with an emphasis in terrorism financing to law enforcement personal at the U.S. FUSION Centers throughout the U.S.

**California Narcotic Officers' Association (CNOA) –** (2007- 2010)
- Developed and taught an 8-hour **"Money Laundering for Local Law Enforcement"** course to California Peace Officers. This course was certified by the California Commission on Peace Officer Standards and Training (POST) and adopted by CNOA.

3

**National University**, San Diego, California (1997 - 2012). **Adjunct Professor**
- Developed, wrote and taught undergraduate courses in write-collar & organized crime, criminal law & procedure, court systems, correctional systems, constitutional law and principles of investigation.

**Grantham University,** Kansas City, Missouri (2007 – 2009) **Adjunct Professor**
- Taught online undergraduate courses in Computer Crime Scene Investigation, Introduction to Computer Crime and Introduction to Criminal Justice.

**San Diego Regional Public Safety Training Institute**, San Diego, California (1993 – 2003)
- Developed and taught a four-hour in-service course on **"Financial & Money Laundering Investigations for California Police Officers".**


**Speaking Engagements with ACAMS\***
- ACAMS 16th Annual AML & Financial Crimes Conference, Las Vegas – September 2017
- ACAMS 12th Annual AML & Financial Crimes Conference, Las Vegas – September 2013
- ACAMS Southern California Chapter – December 2012
- ACAMS Southern California Chapter – December 2011

\*Association of Certified Anti-Money Laundering Specialists

# EXHIBIT B

# Un-Layered Transaction

**Direct Wire Transfer -- $100,000 Chicago to Miami**

**$100,000 Chicago**

Outgoing Wire - Debit

**$100,000 Miami**

Incoming Wire - Credit



# Layered Transaction

### Indirect Wire Transfer -- $100,000 Chicago to Miami

$100k Chicago

$38k Cayman Is.

$17k Macau

$35k Calgary

$27,000 London

$18k Dubai

$100k Miami

7 Bank Accts
6 Countries

Funds from one source